COMMONWEALTH *vs.* GARY FRANKLIN
(and a companion case[1]).

Suffolk. September 12, 1978. — December 21, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Constitutional Law*, Equal protection of laws, Search and seizure. *Practice, Criminal*, Motion to dismiss, Motion to suppress. *Search and Seizure. Arrest. Evidence*, Cross-examination, Redirect examination, Bias of government witness, Selective prosecution, Judicial discretion. *Selective Prosecution.*

When a defendant in a criminal case has raised a reasonable inference of selective prosecution, the Commonwealth must rebut that inference or suffer dismissal of the underlying complaint. [894-895]

In a criminal case in which black defendants made a claim of selective prosecution and proffered evidence spanning a year and a half concerning numerous types of criminal offenses committed by white individuals in the housing project in which the defendants were arrested on charges of assault with a dangerous weapon, assault and battery with a dangerous weapon, and various firearms offenses, the judge erred in limiting the evidence to crimes involving firearms committed on the three days preceding the defendants' arrests. [895-897]

At a criminal trial in which black defendants made a claim of selective prosecution, the judge did not err in refusing to believe testimony

[1] Commonwealth *vs.* Robert Phifer.

offered by the defendants that on the day prior to their arrest a white man who was brandishing a rifle at a group of black residents of the housing project at which the defendants were arrested had his rifle taken away by police only upon demand of the black residents and that the police returned it to him a few minutes later and escorted him home without arresting him, even though the Commonwealth offered no evidence to contradict the testimony. [897-898]

The warrantless entry of police into an apartment and seizure of shotgun and pistol cases in plain view was justified where the police were essentially in hot pursuit, the alleged crime was one of violence, the alleged suspect was armed, there was a substantial likelihood that the suspect would escape if not apprehended, and no indication that the violence itself had come to a halt. [898-900]

A defendant in a criminal case had standing to bring a motion to suppress a shotgun seized in an apartment even though he testified he was never in the apartment, where the prosecution presented ample evidence to the contrary. [900]

At a criminal trial, evidence that police officers observed the defendant carrying what appeared to be a shotgun run up a flight of stairs in an apartment building and into an apartment, that the officers were admitted into the apartment where they observed the defendant sitting in a chair, and that one of the officers walked into a . bedroom, observed a mattress with a bulge in it, reached underneath and seized a shotgun was sufficient to warrant a finding that° the warrantless search was justified by exigent circumstances. [901-902]

At a criminal trial, there was sufficient evidence to warrant findings that the defendant's arrest was legal, that the defendant's wife freely and voluntarily consented to the search of her apartment, and that her consent was not the consequence of an illegality in the arrest of the defendant. [902-903]

The record of a criminal trial in which two black defendants were charged with various assault, assault and battery, and firearms offenses arising out of an incident at a predominantly white housing project did not support the defendants' contentions that they were effectively precluded from attempting to show, through cross-examination of the Commonwealth's witnesses, that the witnesses' testimony was fabricated and motivated by racial hostility and prejudice. [903-905]

At a criminal trial, the judge did not err in admitting testimony that a defense witness held a switchblade knife in her hand during an incident that occurred on the evening preceding the defendants' arrests and in allowing the introduction of the knife itself where defense counsel had opened up the subject. [905-906]

INDICTMENTS found and returned in the Superior Court on October 15, 1975.

Motions to dismiss the indictments and to suppress evidence were heard by *Roy*, J., and the cases were tried before him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Jonathan Shapiro* for the defendants.

*John F. Donovan*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant Gary Franklin was tried before a Superior Court jury on indictments charging assault with a dangerous weapon, assault and battery with a dangerous weapon, and unlawfully carrying a revolver on his person. The defendant Robert Phifer was tried before the same jury on indictments charging identical assault and assault and battery offenses, possession of ammunition without a firearms identification card, and unlawfully carrying a shotgun on his person. Before trial, both defendants made timely motions to dismiss their indictments as being selective and racially motivated, and to suppress certain evidence on the ground that it was obtained during illegal searches and seizures. After a three-day hearing, the trial judge denied both motions. Franklin was convicted of unlawfully carrying a revolver on his person. Phifer was convicted of possessing ammunition without a firearms identification card and of unlawfully carrying a shotgun on his person. With Phifer's permission, the judge ordered that his possession conviction be placed on file. The judge then imposed on each defendant the minimum mandatory sentence of imprisonment for one year in a house of correction and stayed execution of those sentences pending appeal.

The defendants appealed, pursuant to G. L. c. 278, §§ 33A-33G, arguing four assignments of error: (1) the denial of their motions to dismiss, (2) the denial of their motions to suppress, (3) the judge's limitation of the de-

fendants' attempt to cross-examine government wit-
nesses to show bias, and (4) the admission of certain evi-
dence during trial.[2] This court, on its own motion, ordered
direct appellate review. We find error only in the judge's
rulings on the motions to dismiss, which placed on the
defendants too great a burden of proof and too narrowly
limited the dates and nature of crimes to be considered.[3]
Accordingly, the motions to dismiss must be remanded
for a new hearing.

[2] Neither in these appeals, nor in any motion for a new trial
addressed to the judge, did the defendants raise the issue whether the
instructions to the jury should have permitted them to consider self-
defense or defense of others as to the charges of illegal gun carrying.
Although the defendants seasonably raised self-defense as to the as-
sault and the assault and battery charges, they did not take the same
measure as to gun carrying, either by requests for instructions, or
objections or exceptions to the charge to the jury.

Thus, since these issues are not before us, we express no opinions
here as to the questions whether the evidence warranted inferences
that there was such a direct and immediate threat of death or serious
injury to either or both of the defendants or others as to justify the
momentary carrying of firearms; whether it was the Legislature's
intent that it shall be a criminal offense, under G. L. c. 269, § 10 (a),
for an unlicensed person to carry a firearm, where such "carrying" is
caused by a necessity to defend the carrier or others against an im-
mediate threat of serious injury or death; and whether it would be
valid under the United States Constitution (e.g., Amendments 8 and
14) or related provisions of the Massachusetts Constitution to hold
c. 269, § 10 (a), applicable to conduct thus directly motivated by self-
defense or defense of others. See Commonwealth v. Jackson, 369 Mass.
904, 915 (1976), and Commonwealth v. McQuoid, 369 Mass. 925, 927
(1976), upholding the facial constitutionality of the statute. See also
Commonwealth v. Seay, ante 735, 738-742 (1978), for a discussion of
gun carrying by a defendant in his dwelling as contrasted to the same
conduct outside the dwelling.

[3] We use the term "error" here necessarily but reluctantly, since the
judge was presented with a constitutional concept (discriminatory
enforcement) as to which there were no Massachusetts precedents for
his guidance. Commonwealth v. King, 374 Mass. 5 (1977), which deals
with the issue, was decided by this court after the trial of the instant
cases. The judge was faced with wide offers of collateral proof, if a
matter of constitutional import can ever be called collateral, and he
had to set some limits to that proof. The judge's deep concern for the
correctness of his rulings, in light of the mandatory sentences in-
volved, is shown by his statements in the record, particularly the
following: "That whole situation, it seems to me, is utterly repugnant

We summarize the pertinent facts as follows. The incidents out of which these indictments arose occurred at the Maverick Street housing project in East Boston. That housing project and its surrounding area had been, for almost two years prior to trial, the scene of repeated violent confrontations motivated by racial intolerance and hatred. On August 27, 1975, at approximately 10 P.M., a group of several unidentified white persons stopped a tactical patrol force cruiser which was assigned to the Maverick Street housing project. The persons told officers Ricci and Fagone that a boy had been shot[4] by a black man wearing a green shirt and gold-rimmed glasses and that the man had run into the housing project building at 66 Grady Court. As the officers proceeded to that address, Officer Ricci heard what sounded to him like a shotgun blast.[5] By the time the officers reached 66 Grady Court, a large crowd of white persons had gathered in the courtyard in front. Officer Ricci noted that the crowd was yelling and screaming and described the scene as a frightening one with great potential for violence.

On entering the first floor hallway of the apartment building, the police observed the door of apartment 115, the defendant Phifer's apartment, to be approximately five or six inches ajar. Without obtaining or requesting permission, Officer Ricci entered the apartment, observed and seized a shotgun case which was lying on the floor, then walked down a corridor into the bedroom and observed and seized a pistol case which was lying on top

to our ideas of a free society under the law. If there were a way in which I could place these cases on file or suspend them, I would do so."

[4] The boy who allegedly was shot was government witness Michael Everett.

[5] Timonthy Bibbo, another government witness, testified that he felt a tingle on his leg as the shotgun blast occurred. Presumably, some of the pellets from the defendant Phifer's shotgun struck him. However, the doctor reading Bibbo's medical report testified that Bibbo suffered no lesions, wounds, or injuries as a result of the alleged blast.

of a dresser. Mrs. Phifer and her two children were in the apartment at the time. However, it appears that no conversation took place. When Officer Ricci returned to the building hallway, he saw a man coming down the stairs holding what appeared to be the butt of a shotgun. However, before Officer Ricci could see his face, the man turned and ran back up the stairs.

Almost simultaneously, Officer Ricci and the several other police officers who had since arrived heard three shots come from above. They ran up the stairs to the third floor, where Officer Cerundolo saw a black man wearing a green shirt run into apartment 124. One of the officers knocked on the door of that apartment. It was opened by someone inside. The defendant Franklin, who fit the description of the alleged assailant, as originally reported to the police by the group of white persons, was sitting in a chair and was placed under arrest immediately. Officer Ricci then walked into a bedroom, observed a mattress with a bulge in it, reached underneath and seized a shotgun. He then pushed open the door of another room, from which the defendant Phifer emerged. Phifer was dressed in the same manner as the man Officer Ricci had seen run up the steps moments before. However, Officer Ricci did not place him under arrest. Instead, he told another officer to hold Phifer while he searched the room. When Officer Ricci came out of the room, Phifer was no longer in the apartment.

On arriving at the police station, Officer Ricci described the man he had seen on the steps and later in apartment 124 to Captain Bradley and another policeman at the station. They recognized the man described as the defendant Phifer and, without seeking or obtaining any warrants, accompanied Officer Ricci back to apartment 115 at 66 Grady Court. Once there, they knocked on the door, which was opened by Mrs. Phifer. Phifer was placed under arrest and advised of his rights. Captain Bradley then asked Mrs. Phifer if the police could look around the apartment. He testified, and the judge found

as matter of fact, that she consented. One hundred and twenty-three rounds of .22 caliber ammunition were found in and seized from the inside of a clothes dryer in the kitchen. A .22 caliber revolver was later found underneath Phifer's automobile, which was parked in a lot adjacent to 66 Grady Court.

1. *The Motions to Dismiss.*

Franklin and Phifer, who are both black, filed motions to dismiss on the grounds that the prosecution of only black persons on serious criminal charges arising out of continuous and violent racial confrontations at the Maverick Street housing project violated their rights to equal protection of the laws. The defendants filed six affidavits in support of their motions and placed in evidence the testimony of six defense witnesses. The Commonwealth called no witnesses and offered no evidence in rebuttal.[6]

The evidence presented in support of the motions to dismiss tended to show the following. The period between April, 1975, and September, 1976, was one of extreme racial tension in East Boston. Both East Boston as a whole and the housing project in particular were overwhelmingly white. In April of 1975, gangs of white youths began roaming the housing project, stoning the homes of black residents, breaking their windows, firebombing their apartments and assaulting the blacks themselves. When asked to make arrests, the police refused and, in some cases, did so mockingly. When the black residents sought to have complaints issued in the Municipal Court

[6] The court called Officer Ricci briefly to testify with respect to an incident related by the defendant Phifer and his wife. The incident involved William Marangiello, one of the government witnesses, and allegedly occurred on August 27, 1975. The Phifers testified that Marangiello was holding a handgun while standing with a group of other white youths in front of 66 Grady Court. They further testified that Officer Ricci saw the handgun but made no attempt to take it away from Marangiello. Instead, he told Marangiello to put it away and that the police would take care of the situation. Officer Ricci denied that the incident ever occurred, and the judge believed his denial.

of the East Boston District on their own, the clerk first held hearings and then refused, although he routinely issued complaints against black persons without hearings when such complaints were sought by whites. Fearful of the white gangs and afraid that the police would not protect them, some of the black residents invited friends to their homes hoping that their presence might provide some measure of protection. These people also became the targets of white violence and the objects of police persecution rather than protection.[7]

Phifer and his family, who lived in the housing project, and Franklin, the Phifers' nephew, directly suffered the effects of this situation. On August 25, 1975, Mrs. Phifer heard a group of white youths, whom she had just seen breaking the windows of another black resident's apart- ment, shout, "Phifer, you're next." On August 27, 1975, Phifer and Franklin went to the Boston office of the National Association for the Advancement of Colored People to ask for assistance. Edward Redd, the executive secretary, telephoned the office of the Boston police commissioner and was assured that the commissioner was aware of the situation and that police protection would be provided. Despite this assurance, a shower of rocks, bricks and bottles was thrown against the Phifers' apartment on the night of August 27, 1975, and nine of their windows were broken.

The defendants supplemented the testimonial evidence given by introducing records of the findings and orders issued in the few judicial proceedings that blacks did manage to institute during this period. On August 31, 1975, a judge of the Housing Court of the City of Boston issued an injunction requiring the Boston police to provide twenty-four hour a day protection for residents of

---

[7] All of this evidence concerning 1975 and 1976 was presented by the defense. The trial judge made no findings as to what he found to be the actual circumstances, since he ruled that most of this evidence was too remote to be considered.

the East Boston housing project. The order issued on a finding that the police had neither discharged their responsibility to maintain law and order nor taken reasonable measures to protect black residents from white violence.[8] The violence and unequal treatment persisted nevertheless. In May of 1976, black housing project residents found it necessary to obtain a Housing Court order authorizing the issuance of complaints against eight white individuals who had stoned their homes.[9] As a result of these complaints, two of the youths who testified against the defendants at the instant trial[10] were ordered to vacate the housing project because of their continued attacks against black residents. At about the same time, black housing project families brought a Federal civil rights action against several of the same white youths and others. In that action, the judge found that the youths "acting in concert, engaged in the throwing of rocks and other missiles at and into premises occupied by some of the plaintiffs and vilified several of the plaintiffs with racial slurs and insults. At least on one occasion certain of the defendants threatened to drive black tenants out of East Boston and on another occasion several unidentified persons attired in the infamous costume of the KKK were observed . . . ."[11]

The defendants allege three errors with respect to the judge's denial of their motions to dismiss. First, that the judge imposed on them an incorrect burden of proof. Second, that he incorrectly limited the incidents that he would consider relevant to those occurring on August 25 through 27 of 1975 and involving the use of firearms. Third, that he abused his discretion in refusing to believe

---

[8] The proceeding is described in *Police Comm'r of Boston* v. *Lewis*, 371 Mass. 332 (1976).

[9] *Boston Hous. Auth.* v. *Marangiello*, Housing Court No. 04957 (filed August 25, 1976).

[10] William Marangiello and Michael Everett.

[11] *Swan* v. *Marangiello*, No. 76-2312-M (D. Mass. July 1, 1976).

uncontradicted testimony given by two defense witnesses. We agree with the defendants' first two contentions.

*Burden of Proof.*

It is well established that the Fourteenth Amendment to the United States Constitution does not countenance arbitrary or unequal application of impartial laws. *Commonwealth* v. *King*, 374 Mass. 5, 20 (1977). *Yick Wo* v. *Hopkins*, 118 U.S. 356, 373-374 (1886). If government can effect a discrimination against any class of people through selective implementation of its laws, then "the insertion of provisions to guard the rights of every class and person in . . . [our National Constitution] was a vain and futile act." *Yick Wo* v. *Hopkins, supra* at 362. It is equally well established, however, that prosecutors and other law enforcement officers enjoy considerable discretion in exercising some selectivity for purposes consistent with the public interest (e.g., forgoing prosecution in the interest of gaining a cooperative witness). *Commonwealth* v. *King, supra* at 19. *Oyler* v. *Boles*, 368 U.S. 448, 456 (1962). Because we presume that criminal prosecutions are undertaken in good faith, without intent to discriminate, the defendant bears the initial burden of demonstrating selective enforcement. See *Manning* v. *Municipal Court of the Roxbury Dist.*, 372 Mass. 315 (1977). In order to meet this burden, the defendant must present evidence which raises at least a reasonable inference of impermissible discrimination. *Commonwealth* v. *King, supra* at 22. *United States* v. *Scott*, 521 F.2d 1188 (9th Cir. 1975). *United States* v. *Berrios*, 501 F.2d 1207 (2d Cir. 1974). *United States* v. *Berrigan*, 482 F.2d 171 (3d Cir. 1973). The defendant must show that a broader class of persons than those prosecuted has violated the law, *Ah Sin* v. *Wittman*, 198 U.S. 500 (1905), that failure to prosecute was either consistent or deliberate, *Oyler* v. *Boles, supra; Edelman* v. *California*, 344 U.S. 357 (1953), and that the decision not to prosecute was based on an impermissible classification such as race, religion, or sex. *Com-*

*monwealth* v. *King, supra. Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 365 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972).

The judge in the case before us stated the defendants' burden of proof to be "far heavier than making a prima facie case ... something in between the fair preponderance of the evidence and proof beyond a reasonable doubt." In doing so, he erred. We stated as dictum in *King* and now we hold that once a defendant has raised a reasonable inference of selective prosecution, the Commonwealth must rebut that inference or suffer dismissal of the underlying complaint. At that point, and where it appears that the government is in ready possession of the facts, it is not unreasonable to require the government to come forward with evidence and to make its records and evidence available. See *United States* v. *Crowthers*, 456 F.2d 1074, 1078 (4th Cir. 1972).

*Time and Type of Crime Limitations.*

Although the judge heard evidence spanning a year and a half and involving numerous types of criminal offenses, he ruled that he would consider evidence only of crimes involving firearms committed on the three days preceding the defendants' arrests. While we recognize that a trial judge has broad discretion as to the admissibility of evidence concerning collateral matters, see *Commonwealth* v. *Franklin*, 366 Mass. 284, 289 (1974), and cases cited, it is our opinion that, in this case, where the proffered evidence related directly to the constitutional issue, the judge limited the evidence too narrowly.[12]

A claim of selective prosecution is predicated on a showing that others who are situated similarly to the defendant remained unprosecuted for similar conduct.

---

[12] This is not to say that broad discretion does not remain with the judge even in dealing with the constitutional concept. Reasonable limits as to the time and nature of episodes must be set and should be determined by considerations of relevancy.

*Commonwealth* v. *King, supra. Yick Wo.* v. *Hopkins, supra. United States* v. *Scott, supra. United States* v. *Berrios, supra.* We are fully aware that most selective prosecution cases involve discriminatory enforcement of a single statute or common law prohibition. However, we do not consider that fact as justification for the narrowness of the judge's ruling. We note at the outset that the defendants were charged with assaults and assaults and batteries with dangerous weapons. These are crimes identical to those which allegedly were committed by whites. That fact alone should have lent at least partial relevance to much of the disregarded evidence. However, we are willing to go further and hold that evidence of all types of violent crimes involving dangerous weapons, regardless of the nature of the weapons used, was relevant on all of the defendants' indictments. We grant that there are common sense distinctions between using firearms and using rocks and firebombs. However, we perceive both legal and common sense similarities as well. When executed with the requisite venom, all are crimes of violence involving the possibility of death or serious bodily injury.

We conclude that the time limitations imposed were similarly too narrow. We are aware of no court that has so severely restricted the evidence that it would consider on a claim of selective prosecution. In fact, courts traditionally have done quite the opposite. See *United States* v. *Falk,* 479 F.2d 616 (7th Cir. 1973) (evidence covered 1967-1970); *United States* v. *Crowthers, supra* (six-month period examined); *United States* v. *Robinson,* 311 F. Supp. 1063 (W.D. Mo. 1969) (evidence of illegal government wiretapping covered period from 1940 to 1966). In the circumstances shown here, we do not think that the defendants should have been limited in proof to incidents of failure to arrest occurring on the same day or within a few days of their own arrests. The defendants demonstrated a two-year period of racial confrontation in the Maverick Street housing project, during which many in-

cidents of violence occurred. They also alleged that the police, prosecutors and court officials assigned to work in that area insulated whites from being punished for their participation in those incidents. Claims of selective prosecution implicate the conduct of all State officers charged with enforcing the criminal laws. Accordingly, we hold that all of the evidence which the defendants introduced, beginning with events occurring in April of 1975, and continuing right through to the day of the defendants' hearings, was relevant on their motions to dismiss.[13]

*Uncontradicted Testimony.*

In attempting to comply with the judge's time and type of crime limitations, the defendants produced evidence of two separate incidents. One of those incidents is not relevant to this appeal.[14] The other involved a white man who allegedly brandished a rifle at a group of black residents and their white friends in a housing project courtyard on the evening of August 26, 1975. Two witnesses testified that the man was cursing and shouting racial epithets and that he appeared to be either crazy or drunk. The police arrived in answer to a call some ten or fifteeen minutes into the incident. However, they made no attempt to take the man's rifle away. Instead, they told the crowd to go home. When one of the witnesses protested and asked the police to take the gun away, they did. However, they returned it a few minutes later and escorted the man home without arresting him. The Commonwealth offered no evidence to contradict the witnesses' testimony. The judge nonetheless refused to believe it, finding it inherently incredible in light of the existing tense situation and its potential for violence.

The defendants argue that the egregiousness of the alleged police conduct involved should not insulate it

---

[13] The evidence indicated that the pattern of relevant events began in April of 1975. However, it is possible that evidence at a new hearing could show relevance of episodes which occurred prior to that date.

[14] See note 4, *supra.*

from judicial review. They maintain that the judge's ruling, "if sustained, would leave . . . [the defendants] in the unenviable position of having been so badly wronged that they are denied any remedy . . . ." Although there is some force to these arguments, we are unable to find any error. The credibility of witnesses' testimony is within the province of the trier of fact. *Davis* v. *Boston Elevated Ry.*, 235 Mass. 482, 502 (1920). The rule is the same even though the proof offered is in support of a constitutional claim, and even though the evidence is uncontradicted. Although it can be argued that a logical inference to be drawn from the lack of rebuttal is that the witnesses' testimony was true, we are unable to label that as the only logical inference. Witness credibility is a factor, and in the circumstances it is for the trial judge's assessment.

2. *The Motions to Suppress.*

There are three separate searches involved in this case. The defendants argue that the judge erred in refusing to suppress evidence obtained in each of them. We do not agree and shall discuss the constitutional propriety of each search separately.

*The First Search of Apartment 115.*

The judge upheld Officer Ricci's seizure of the shotgun and pistol cases on the ground that they were in plain view. The defendants do not dispute this. Rather, they argue that Officer Ricci lacked justification for initially entering the apartment.

It is true that the plain view doctrine requires that there be prior justification for the police intrusion in the course of which incriminatory evidence is inadvertently discovered. *Commonwealth* v. *Walker*, 370 Mass. 548, 557, cert. denied, 429 U.S. 943 (1976). *Commonwealth* v. *Forde*, 367 Mass. 798, 808 (1975) (Hennessey, J., concurring). It is also true that when a search is conducted without a warrant, the burden is on the Commonwealth to show that the search falls within the class of permissible exceptions. *Commonwealth* v. *Saia*, 372 Mass. 53, 56 (1977). *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974).

However, we think that the facts of this search place it within the class of exceptions. We conclude that there were both probable cause and exigent circumstances justifying the initial entry.

Although the people with whom Officer Ricci spoke were not shown to be reliable informants, we do not consider that fact dispositive. In *Aguilar* v. *Texas*, 378 U.S. 108, 112-116 (1964), the United States Supreme Court held that, where there is sufficient corroboration of initially unreliable information, the corroboration and initial information could combine to provide the requisite probable cause. See *Commonwealth* v. *Stevens*, 362 Mass. 24 (1972). We conclude that the information provided by the group, the information provided by others along the way, and the shotgun blast heard by Officer Ricci combined to do just that. The defendants argue that, even if the police were justified in entering the outer door of the apartment building, they were not justified in singling out apartment 115 for search. However, we conclude that, given the speed with which events were occurring, and the potentially dangerous nature of those events, the open door of apartment 115 sufficiently distinguished that apartment to make it at least of initial interest to the police. When Officer Ricci observed the shotgun case immediately on opening the door, he had the right to search further to find the person who might be armed with the contents of that case.

We discern the requisite exigency justifying this warrantless search in the fact that the police were essentially in hot pursuit. See *Warden, Md. Penitentiary* v. *Hayden*, 387 U.S. 294 (1967). Moreover, the alleged crime was one of violence, the alleged suspect was one who was armed, and not only was there a substantial likelihood that the suspect would escape if not apprehended, but there was no indication that the violence itself had come to a halt. See *Commonwealth* v. *Walker, supra.* In such circumstances, it would be impracticable for the police to obtain a warrant, and we would speak in disregard of the safety

of the police and others if we were to conclude that a warrant was necessary.

*Search of Apartment 124.*

The judge denied the defendant Phifer's motion to suppress the shotgun seized in apartment 124 on the ground of lack of standing. The judge found that Phifer had no proprietary interest in that apartment, that he was not present during the search[15] and that, even if he were present, his status was that of a trespasser. We cannot agree with the judge's latter two rulings.

Although Phifer testified that he was never in the apartment, the prosecution presented ample evidence to the contrary.[16] We think that to allow the prosecution the benefit of its witnesses' testimony for purposes of establishing probable cause and then to ignore that testimony when it might aid the defendant in establishing standing would be inconsistent with this court's general effort to insure fairness at every stage of a defendant's trial. We note that similar concerns prompted the United States Supreme Court to confer on defendants automatic standing in possession cases. See *Jones* v. *United States*, 362 U.S. 257 (1960). The judge's alternative ruling that Phifer's status in apartment 124 was trespassory at best is entirely unsupported by the record. In fact, there was evidence that the apartment was occupied by a friend of the Phifers and that the friend was in the apartment at the time the police entered. Because we conclude that Phifer was entitled to bring this motion to suppress, we turn to the merits of the search and seizure.

---

[15] The United States Supreme Court has held that the rightful presence of a defendant at the place of search and seizure is a sufficient source of standing in itself. See *Jones* v. *United States*, 362 U.S. 257 (1960). The Court recently affirmed this position in *Brown* v. *United States*, 411 U.S. 223, 227 n.2 (1973).

[16] This contradiction in testimony might well have been avoided had Phifer been advised that his testimony during the pretrial hearing could not be used as evidence against him at trial. See *Simmons* v. *United States*, 390 U.S. 377 (1968). No request that Phifer be so advised was made by counsel.

This court has held that a warrantless search must be tied strictly to and justified by the circumstances that rendered its initiation permissible. *Commonwealth* v. *Silva,* 366 Mass. 402 (1974). The defendant Phifer maintains that the only justification for searching apartment 124 after Franklin's arrest was to look for the other man who was seen earlier descending the stairs. The defendant Phifer cites *Selectmen of Framingham* v. *Municipal Court of the City of Boston,* 373 Mass. 783 (1977), in support of this contention. However, we think that the facts of that case render it inapposite to the one before us today. A man was found shot outside his home. He stated that he had been shot by an unknown assailant who was also outside. The doors and windows of his home were completely secured. However, after the man was taken to the hospital, the police broke into the home and searched it. We stated in our opinion in that case that "[t]here was no emergency, no hot pursuit of a fleeing felon, no imminent removal or destruction of evidence .... The hypothesis that the assailant might have taken refuge in the house may be more than 'a flight of imaginative fancy.' ... But it falls far short of establishing urgent need to search dresser drawers in a second floor bedroom." *Id.* at 786, quoting from *Commonwealth* v. *Hawkes,* 362 Mass. 786, 789 (1973). The same cannot be said of the situation currently before us. In fact, we view the facts of the instant situation as placing it squarely within the rule in *Warden, Md. Penitentiary* v. *Hayden, supra.*

In *Hayden,* the police were informed that an armed robbery had taken place. They were further informed that the suspect had entered a certain house less than five minutes before the police arrived there. The Supreme Court held that the police acted reasonably in entering the house and conducting a search for the suspect and any weapons which he might use against them. In his majority opinion, Mr. Justice Brennan stated: "The Fourth Amendment does not require police officers to

delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons *and* weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape" (emphasis supplied). 387 U.S. at 298-299. The only distinction that we perceive between the case before us and *Hayden* is that the latter involved searching the inside of a basement washing machine while the former involves investigating an obvious and somewhat ominous bulge in a mattress. In our view, that distinction renders it even more clear that the police conduct in this case was reasonable.

*Second Search of Apartment 115.*

We state at the outset that this second search of the Phifers' apartment cannot be sustained under either *Warden, Md. Penitentiary* v. *Hayden, supra,* as a hot pursuit, or under *Chimel* v. *California,* 395 U.S. 752 (1969), as a search incident to arrest. Rather, its legality turns on the validity of Mrs. Phifer's consent.

The defendants argue that Phifer's arrest was illegal, because the police failed to obtain a warrant. The defendants further argue that Mrs. Phifer's consent to the search was the direct and immediate consequence of the unauthorized arrest and should be invalidated as the " 'fruit' of official illegality." *Wong Sun* v. United States, 371 U.S. 471, 485 (1963). We do not agree that Phifer's arrest was illegal. Once again our ruling hinges on a finding of both probable cause and exigency.

Officer Ricci testified that he saw Phifer both on the stairs and in apartment 124. Thus, he was at least hypothetically able to give a description to the two officers at the police station. Thos officers testified that they knew the defendant Phifer and where he lived and that they were able to identify him as the man whom Officer Ricci had described. The judge believed the officers' testimony. Given that, we hold on the facts that there existed proba-

ble cause. We find the requisite exigency in the fact that both Phifer and the handgun remained at large. The defendants maintain that there was no longer any danger of violence at the housing project, because the crowd had been dispersed and police officers were stationed in the area. However, we are unwilling to fashion arrest, search and seizure laws on so tenuous an assertion. The defendants had already presented ample evidence during their pretrial hearing of the consistently volatile situation existing at the housing project and of the police failure to control it. We can only conclude that the defendants urge lack of exigency solely because Phifer is black and was therefore unlikely to start another eruption. However, if we tied the hands of the police in this case, we would be tying their hands in all similar cases. Although Phifer may have had no intention of using his weapon, another defendant in similar circumstances in another case may have other designs. We cannot base our search and seizure rulings on so speculative and intangible a factor as personality.

Because we hold that Phifer's arrest without a warrant was legal, we have no reason to tamper with the judge's ruling. Although Mrs. Phifer denied having offered her consent, Captain Bradley testified that she did so freely and voluntarily and without any coercion. See *Commonwealth* v. *Walker, supra; Schneckloth* v. *Bustamonte*, 412 U.S. 218, 222 (1973). The judge obviously, as was his privilege, believed Captain Bradley's testimony.

3. *Limitation of Defendants' Cross-examination.*

The Commonwealth's case against each of the defendants depended principally on the testimony of several young white witnesses. There was evidence to show that these witnesses had been involved in numerous attacks against blacks living in the Maverick Street housing project. It was thus part of defense counsel's strategy to show, through cross-examination, that the witnesses' testimony was fabricated and motivated by racial hostility and prejudice.

This court has consistently held that cross-examination for the purpose of demonstrating bias is a matter of right. See *Commonwealth* v. *Ahearn*, 370 Mass. 283 (1976); *Commonwealth* v. *Carroll*, 360 Mass. 580 (1971). Its denial or significant diminution calls into question the very integrity of the fact-finding process. *Berger* v. *California*, 393 U.S. 314, 315 (1969). However, although the right of cross-examination in this area is one to be jealously guarded, it is susceptible of some limitation. The most common instance of acceptable limitation occurs when the evidence sought to be introduced would merely be cumulative of that which is already before the jury.

The defendants argue that they were precluded from cross-examining the prosecution's witnesses about hostility toward blacks living in the housing project, about attempts to cause blacks to move out of the housing project, and about connections with an organization known as the Junior KKK. The defendants contend that the judge ruled that testimony of racial hostility was relevant only to the extent that it supported the defendants' claim of self-defense. Close examination of the entire record reveals these assertions to be based on rulings taken out of context.

Although there were instances in which questions designed to elicit racial bias were excluded, there were many more in which they were allowed. Michael Everett and William Marangiello specifically admitted to having thrown rocks and other projectiles at the apartments of black residents of the Maverick Street housing project. Both witnesses were allowed to respond to questions concerning whether they had any objections to black families living in the housing project, and, not surprisingly, they responded that they had none. Timothy Bibbo was asked on more than one occasion whether he had thrown rocks or other missiles at the windows of blacks living in the housing project. He stated that he had not. Both he and Marangiello were also asked whether they were members of the Junior KKK and whether they had observed any members of that organization roaming around the housing project. They answered no to the above inquiries.

Moreover, defense counsel introduced in evidence prior criminal convictions of all three witnesses involving assault and battery, the malicious destruction of property, and the malicious threatening of a person (who happened to have the same surname as one of the defense witnesses).

In such circumstances, we cannot agree that the defendants were effectively precluded from showing that the testimony of government witnesses was the product of racial animus. Nor do we think that the defendants were prevented from presenting to the jury their theory that the witnesses brought charges against the defendants as part of their concerted effort to drive blacks out of the housing project. In fact, after reviewing the record, we find it inconceivable that the prejudices and possible motives of these prosecution witnesses could have gone unnoticed by the jury. Even the assistant district attorney referred to the witnesses as "project punks" and "thugs" when giving his closing statement.

It is thus our opinion that, even assuming the unexpected, i.e., that the witnesses would have answered the excluded questions in such a way as to support the defendants' contentions, any additional evidence of racial bias would have been cumulative of that which was already quite apparent. Given that, it was within the judge's discretion to limit the defendants' cross-examination.

4. *Introduction of Certain Evidence During Trial.*

The defendants finally aver that the judge erred in admitting in evidence the prior bad conduct of a defense witness. The evidence consisted of testimony that Mrs. Phifer held a switchblade knife in her hand during an incident that occurred on the evening preceding the defendants' arrests and of the introduction of the switchblade knife itself.

The defendants contend that specific acts of prior misconduct, not material to the case in which a witness testifies, cannot be shown through the testimony of impeaching witnesses. We do not dispute the defendants' contention. However, the testimony in question did not arise in the circumstances that the defendants describe. It arose

Commonwealth v. Franklin.

during defense counsel's attempt to discredit a govern-
ment witness by showing that, rather than dispersing the
angry white crowd that had gathered during the incident
in question, the police officer unwarrantedly picked on
Mrs. Phifer instead.[17] Although we concede that the wit-
ness's answer was somewhat unresponsive, we are of the
opinion that defense counsel did open the subject up.
Even if the judge had excluded the answer as unrespon-
sive to cross-examination, the substance of that answer
would have been an appropriate subject for inquiry dur-
ing the prosecutor's redirect examination. Accordingly,
we conclude that the judge acted appropriately in allow-
ing the answer to stand when given.

On redirect examination, the judge allowed the switch-
blade to be marked as an exhibit. He viewed it as explana-
tory of the testimony elicited on cross-examination. This
court has held that the scope of redirect examination
rests within the sound discretion of the trial judge, see
*Cabeceiras* v. *Gauthier*, 362 Mass. 887 (1972), and we do
not think that the judge exceeded the bounds of his dis-
cretion in this instance. Introduction of the knife was
corroborative evidence that the government witness was
telling the truth on cross-examination. Moreover, given
that Mrs. Phifer's possession of the knife had already
been established, we cannot say that the prejudicial effect
of introducing the knife itself outweighed its corrobora-
tive value.

The cases are remanded for further proceedings in ac-
cordance with this opinion. We expect the judge presiding
over the defendants' new hearing to consider relevant
evidence and place reasonable limitations on the nature

---

[17] The following exchange took place on cross-examination: COUN-
SEL FOR THE DEFENDANT: "And it was at that time that you went over
to Mr. Phifer?" THE WITNESS: "I didn't go over to Mr. Phifer, sir. I went
to Mrs. Phifer." COUNSEL FOR THE DEFENDANT: "Why didn't you dis-
perse this crew?" THE WITNESS: "We were attempting to, sir." COUNSEL
FOR THE DEFENDANT: "Well, then, did you go to Mrs. Phifer or did you
try to disperse the crew?" THE WITNESS: "My attention was drawn to
a knife in Mrs. Phifer's hand." MR. BALER: "Objection." THE JUDGE:
"I'm going to allow it in. You were pursuing the situation and opened
it up."

and dates of the episodes that the defendants may introduce. When and if the judge hears credible evidence which raises a reasonable inference of impermissible discrimination, he must require the Commonwealth to come forward with evidence to rebut that inference or suffer dismissal of the underlying indictments.[18] If, after the new hearing on the defendants' motions to dismiss, those motions are properly denied, the judgments of conviction stand affirmed.

*So ordered.*

---

[18] The judge's rulings either denying or allowing the motions to dismiss will be subject to any further appellate rights which may arise during the course of the defendants' new hearing. See G. L. c. 278, § 28E.