COMMONWEALTH *vs.* LOUIS LOTFY.

Worcester.   June 13, 1979. — July 17, 1979.

Present: GOODMAN, GREANEY, & KASS, JJ.

*Probable Cause. Search and Seizure.*

An affidavit in support of a search warrant for gambling paraphernalia which was based on personal observations made by State police officers with special experience in investigating gambling activity and which indicated a pattern of continuous conduct and incriminating acts of the defendant, and also contained the officer's conclusion of gaming violations based on his experience, was sufficient to warrant a finding of probable cause that the premises to be searched were being used for registering bets or conducting other gaming operations. [127-132]

INDICTMENT found and returned in the Superior Court Department on September 18, 1978.

The case was tried before *McCooey,* J., a District Court judge sitting under statutory authority.

*H. Hoover Garabedian* for the defendant.

*Daniel F. Toomey,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. At a trial before a Worcester County jury the defendant was convicted on an indictment brought under G. L. c. 271, § 17, charging him with being "found in a place . . . with books, apparatus and devices used for the purpose of registering bets . . . [on] athletic contests." He has assigned as error: (1) the denial of his motion to suppress evidence and (2) the denial of his motion for a directed verdict.[1]

1. *Motion to suppress.* The gambling paraphernalia introduced at the trial were seized on August 16, 1978, when officers of the State police executed a search warrant at the Milford Lodge of Elks. The search warrant had been obtained earlier that day by Trooper David J. Primeau based on information contained in that officer's affidavit. To establish probable cause the affidavit relied on information supplied "by a person who wished to become an informant" and on personal observations made at the Milford Elks' Lodge by Trooper Primeau and another State police officer over a period of time from June 28, 1978, to August 16, 1978. The defendant argues that his motion to suppress the evidence seized pursuant to the warrant should have been allowed because the informant's tips failed the two-pronged test for the reliability of such hearsay developed in *Aguilar* v. *Texas,* 378 U.S. 108 (1964) (as later refined in *Spinelli* v. *United States,* 393 U.S. 410 [1969], and *United States* v. *Harris,* 403 U.S. 573 [1971]), and because the information in the affidavit did not support a finding of probable cause.[2]

---

[1] A third assignment of error as to the Commonwealth's introduction of certain expert evidence has not been briefed or argued and is deemed waived. Rule 1:13 of the Appeals Court, as amended, 3 Mass. App. Ct. 801 (1975). *Commonwealth* v. *Fleurant,* 2 Mass. App. Ct. 250 (1974).

[2] We have determined it appropriate to deal with the defendant's substantive challenge to the warrant, and we are not inclined to at-

We find it unnecessary to apply the *Aguilar* test to the information given by the informant. An examination of the affidavit, apart from the informant's hearsay, "in a commonsense and realistic fashion" (*United States* v. *Ventresca*, 380 U.S. 102, 108 [1965]), reveals sufficient data to justify a finding of probable cause, as the affidavit is based on personal observations made by State police officers with special experience in investigating gambling activity. *United States* v. *Chuke*, 554 F.2d 260, 262 (6th Cir. 1977).

We summarize the contents of the affidavit.[3] After receiving information that the defendant, the owner of a green Cadillac automobile, was registering bets in the basement rooms of the Elks' Lodge using a telephone listed to number 478-2374, the State police confirmed that a green Cadillac with license plate number 781-701 was registered to Louis Lotfy of 62 South Main Street, Milford. Two State police officers then conducted an investigation over an eight-week period.

On June 28, 1978, the officers observed a green Cadillac with registration number 781-701 parked in the Elks' parking lot at 12:50 P.M. and again at 2:15 P.M.

On July 19, 1978, the officers observed a cardboard box containing "Lucky-Seven" tickets at the back of the Elks' bar; to the right of the box containing the tickets was a

---

tempt to dispose of the case on an argument raised by the Commonwealth for the first time on appeal to the effect that the defendant had no reasonable expectation of privacy in the areas from which the incriminating evidence was obtained, and as a result lacked "standing" to object to the validity and sufficiency of the warrant. See generally *Jones* v. *United States*, 362 U.S. 257 (1960); *Katz* v. *United States*, 389 U.S. 347 (1967); *Mancusi* v. *DeForte*, 392 U.S. 364 (1968); *Commonwealth* v. *Franklin*, 376 Mass. 885, 900 (1978). Compare *Rakas* v. *Illinois*, 439 U.S. 128 (1978).

[3] The affidavit consists of eleven pages typed single space with sixty unnumbered paragraphs. Because of its uncommon length we have not reproduced even those portions of the affidavit which related to the activities in the basement of the Elks' Lodge.

cigar box containing an unknown amount of cash. Conversations among the bar patrons were overhead concerning the baseball games being played that night and their "point spread," and a male was noticed talking to someone in the rear of the boiler room.

On the evening of July 20, 1978, the green Cadillac was seen again in the Elks' parking lot. The police placed eight telephone calls in a ten-minute period to telephone number 478-2374,[4] all of which encountered a busy signal.

On the evening of July 26, 1978, the green Cadillac was seen again in the Elks' parking lot. The police observed a white male[5] leave the car and enter the lodge. Patrons in the bar referred to the male as "Louie." During the evening "Louie" asked the bartender, "Richie" (his son), "to give me a hand setting up back there." The bartender was observed unlocking a storage room, removing from a package a large quantity of white slips of paper and an unknown amount of cash, and carrying the paper and cash into the rear boiler room. The telephone at the back of the bar rang seven times within thirty-five minutes; it was answered on each occasion on the second or third ring by the bartender, who would inform the caller "[N]o, he's out back, I don't have anything here, call him at the other number." Five men who had been standing at the bar reading the sports pages and discussing baseball were observed leaving the bar carrying cash. They each entered the boiler room, conversed briefly with someone in that room and left.

On the evening of July 27, 1978, the officers again visited the bar. The boiler room was open and lights were on in a rear room attached to the boiler room. The telephone at the bar rang several times, and callers were told by the

[4] The affidavit stated that a check of that number with New England Telephone Company revealed that it was listed to the Milford Lodge of Elks.

[5] The affidavit further described this individual as "45-50 years of age, black hair, 5'9" to 5'10", 230-235 pounds."

bartender that "[m]y father is out back, try him at 8-2374." Persons at the bar were overheard discussing "Louie" and expressing the opinion that he "was making out on the Red Sox games and ... was making a killing because the Sox were never beating the line." There was traffic in and out of the boiler room; all visits were short. In the course of the evening "Louie" checked the cash register behind the bar, inquired as to the score of that night's Red Sox game, and upon being told the score commented, "Well I don't care as long as Texas wins—I've got a lot of money from guys on the other side." During the balance of the evening "Louie" engaged persons in the bar in conversation as to that night's baseball games and the different point spreads.

On August 8, 1978, based on information that "Louie" would not be at the Elks but would instead be at home, the police telephoned the number listed to the Elks (a different number from that listed to the telephone in the rear room), inquired whether "Louie" would be there, and were told, "No he worked late, so he's taking his stuff at home."

On the evening of August 10, 1978, the green Cadillac was parked at the Elks' Lodge. In the bar the police overheard conversations concerning point spreads, observed heavy traffic to and from the boiler room, and heard the bartender indicate that "Louie" was in the back room.

Based on the observations just summarized the affiant drew the conclusion that "the actions of the persons as described in this affidavit are consistent with those of persons engaged in the illegal act of registering bets on athletic contests."[6]

All this information together with the reasonable inferences that could be drawn therefrom was sufficient to

___

[6] As discussed hereafter this conclusion is to be weighed in light of the further facts recited by the affiant that he had conducted gaming investigations for various State, local and Federal law enforcement agencies.

permit the Superior Court judge who examined the affidavit to find it probable that the basement rooms of the Milford Elks' Lodge were being used for registering bets or conducting other gaming operations. *Commonwealth v. Vynorius,* 369 Mass. 17, 23 (1975). The sporting ambience around the Elks bar, observations of illegal gaming tickets, pervasive conversation about games and point spreads as well as "Louie's" ability to profit by the inability of the Red Sox to "beat the line" (it was the start of the great collpase), steady phone calls referred to a number apparently listed exclusively to the rear room, surreptitious conversations near the boiler room—all are indicative of a probability that illegal betting was occurring. The comments by "Louie," with the flavor of an admission, that as to one particular game he was pulling for Texas because he had a "lot of money from guys on the other side" were significant to move the conclusion along. Additional support establishing probable cause can also be seen in the steady traffic (more than the summertime maintenance of the heating system plausibly required) observed by the police of bar patrons with cash in their hands to and from the boiler room. It was inferable that the short transactions occurring in the rear room consisted of registering bets. In *Commonwealth* v. *Moran,* 353 Mass. 166 (1967), similar circumstances of a bookie's steady use of a hotel room were held quite significant in supporting a finding of probable cause. As Mr. Justice Spiegel wryly observed on that point, "[t]here is a sound basis for a firm belief that [the defendant] does not perform that daily routine for the purpose of playing solitaire." *Id.* at 170. The existence of probable cause is also firmly buttressed by the inferences drawn by the experienced officer who signed the affidavit that the activities he directly observed were consistent with the use of the premises for the illegal registering of bets. In this context, "[w]eight should be given to the special experience of a law enforcement officer who has executed an affidavit. For example, where such an officer states that

he has drawn inferences from facts which an inexperienced person might not draw from those facts, the magistrate may rely on those inferences." *Commonwealth* v. *Taglieri*, 378 Mass. 196, 199 (1979). See also 1 LaFave, Search and Seizure 463 (1978). Here the judge could rely on Trooper Primeau's conclusion that the facts observed in the course of the investigation carried particular significance because of the officer's special knowledge of how illegal gaming operations are conducted.

Finally, this case is quite unlike the *Taglieri* decision just cited, which is relied upon by the defendant as supporting his contention that the affidavit failed to establish probable cause. In *Taglieri* the affidavit contained sketchy information about two telephone calls more than two weeks apart involving betting talk. The telephone calls were made from an East Boston address to a telephone listed to the defendant. The limited facts presented in the affidavit under scrutiny in that case were held insufficient to permit the magistrate to draw reasonable inferences based on common knowledge to support a finding of probable cause where the officer executing the affidavit drew no inference of gaming violations based on his experience. The affidavit we have considered contains such conclusions on the officer's part. Moreover, it indicates a pattern of continuous conduct and is amply sprinkled with incriminating details pointing to the conclusion that the premises sought to be searched were being used illegally to register bets.

2. *Motion for directed verdict.* The defendant conceded at argument that if the validity of the warrant should be upheld, his motion for a directed verdict was properly denied. The concession is amply supported by the Commonwealth's evidence, consisting in large part of real evidence seized under the authority of the warrant which indicated much more than the defendant's "mere unwitting presence in the same place with apparatus."[7] *Com-*

---

[7] The evidence seized (the significance of which in gaming terms was

*monwealth* v. *Murphy*, 342 Mass. 393, 395-396 (1961). The Commonwealth's evidence was more than sufficient to provide a case for jury consideration as to the defendant's presence at, and involvement with, a flourishing gambling enterprise.

*Judgment affirmed.*

later developed by an expert at trial) included, inter alia, illegal lottery tickets, papers recording pin ball machine pay offs, cards with football "lines," a stamp vending machine which dispensed illegal lottery and blackjack tickets upon insertion of twenty-five cents, "cuff" lists (i.e., papers containing names of debtors and amounts owed to a bookie, the demand paper of the trade), lists of telephone numbers and names consistent with the entries on the "cuff" lists, papers recording bets on athletic contests, and large amounts of currency.