NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13329


COMMONWEALTH  vs.  MICHAEL ROBINSON-VAN RADER.



Suffolk.      January 6, 2023. - May 15, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.



Firearms.  Threshold Police Inquiry.  Constitutional Law, Search and seizure, Reasonable suspicion, Equal protection of laws.  Search and Seizure, Threshold police inquiry, Reasonable suspicion.  Practice, Criminal, Motion to suppress.




Indictments found and returned in the Superior Court Department on August 28, 2018.

A pretrial motion to suppress evidence was heard by Peter B. Krupp, J., and a conditional plea was accepted by Mary K. Ames, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


John P. Warren for the defendant.
Kathryn Sherman, Assistant District Attorney (Michelle Slade, Assistant District Attorney, also present) for the Commonwealth.
Chauncey B. Wood, Kevin S. Prussia, Timothy A. Cook, Asma S. Jaber, & Douglas J. Plume, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

Katharine Naples-Mitchell, Audrey Murillo, & Radha Natarajan, for Criminal Justice Institute at Harvard Law School & another, amici curiae, submitted a brief.

GAZIANO, J.  In the early evening of April 23, 2018, Boston police officers received reports of gunfire in a neighborhood near their headquarters.  Approximately seven minutes later, three officers patrolling in an unmarked vehicle encountered two young Black men, the defendant and J.H. (a juvenile), walking away from the location where shots had been fired.  The two were less than a mile from police headquarters and matched a bare-bones description of the shooters.  The officers stopped and frisked the defendant and J.H. and discovered that each possessed a concealed handgun.  The defendant subsequently was indicted on charges of discharging a firearm within 500 feet of a building, unlawful possession of a firearm, and related offenses.

The defendant filed a motion to suppress the evidence seized from his person, on the ground that the stop was in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights because the officers lacked reasonable suspicion to believe that he had committed a crime.  The defendant also argued that the stop and frisk was unconstitutional because it violated his Federal and State rights to equal protection of the

law.  In support of his argument on equal protection, the defendant submitted statistical evidence that two of the police officers involved, who were assigned to the Boston police department's youth violence strike force, were more likely to stop Black members of the community than individuals of other races.

A Superior Court judge denied the defendant's motion because he concluded that the officers had had reasonable suspicion to stop the defendant to investigate his involvement in the shooting, and reasonable suspicion that he was armed and dangerous to support the patfrisk for a weapon.  In addressing the defendant's equal protection challenge, the judge presumed that this court's revised standard for establishing an equal protection claim under the Massachusetts Declaration of Rights, which was adopted in the context of a traffic stop, see Commonwealth v. Long, 485 Mass. 711, 724-725 (2020), applied as well to a challenge of a pedestrian stop asserted to be racially motivated.  The judge reasoned that, "just as a racially motivated motor vehicle stop would be constitutionally problematic, a racially motivated stop of a pedestrian would also offend the constitutional right to equal protection." Notwithstanding the statistical evidence presented by the defendant, the judge then determined that the Commonwealth had satisfied its burden of establishing that the officers had had a

race-neutral reason for conducting a threshold inquiry, and also for pat frisking the defendant for a weapon.

We conclude that the stop did not violate the defendant's rights under the Fourth Amendment or art. 14, because the officers had had a reasonable articulable suspicion that the defendant had been involved in the shooting.  We emphasize that the equal protection clause provides an independent basis upon which a defendant may rely in pursuing claims of intentional discriminatory application of the law, separate and distinct from the right to be free from unreasonable searches and seizures.  We agree with the judge that the new standard we adopted in Long, 485 Mass. at 724-725, to provide a defendant a more accessible path to pursuing an equal protection claim in the context of a motor vehicle stop, is applicable not only to traffic stops, but also to other police investigations such as pedestrian stops.  We also agree with the judge that, in this case, at the hearing on the defendant's motion to suppress, the Commonwealth demonstrated an adequate, race-neutral reason for the stop, sufficient to rebut the defendant's statistical evidence of discriminatory policing.  Accordingly, we affirm the denial of the defendant's motion to suppress.

1.  Background.  a.  Facts.  The facts are derived from the facts found by the motion judge, supplemented with undisputed evidence from the record that is not contrary to the judge's

rulings.  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

On April 23, 2018, at 7:29 P.M., Boston police received reports and ShotSpotter acoustic alerts of gunfire at a basketball court near Annunciation Road, an area located not far from Boston police headquarters.  Within a minute of the first report, police received two 911 calls detailing the incident. The first caller, "Manny," reported that "[t]here was a bunch of shots just fired," "about . . . eight or so," near a particular address on Annunciation Road.  The second caller, "Marie," called from a location a few blocks away from Annunciation Road, adjacent to the Southwest Corridor Park.  She reported having heard "about six" gunshots, and described seeing two Black males wearing black "hoodies" (sweatshirts with hoods) riding "off on their bikes."  She also reported that the two males on bicycles left the area by riding along Prentiss Street, and then turned right (southbound) onto Tremont Street.  About fifteen seconds after placing the call, Marie was reporting to the 911 operator that she could still see the two males on bicycles, when she said, "I can see the cop coming now."  In an audio recording of the call introduced at the hearing on the defendant's motion to suppress, police sirens are audible in the background of the call.

Following this call, the police dispatcher broadcast a description of the suspects. The first broadcast stated, "I do have a description of two males that were seen on bikes take off on Tremont from Prentiss." Subsequent broadcasts detailed multiple witness's reports that the two males on bicycles were the shooters, and that they were wearing "black hoodies." Although the dispatcher had information from one of the 911 callers that the two males were Black, she did not broadcast the reported race of the suspects over the police radio. The judge found the police response to have been "swift and coordinated."

As the investigation was developing, Officer James O'Loughlin, Jr., was working a paid detail on New Heath Street, slightly more than one-half mile south of the intersection of Prentiss and Tremont Streets. O'Loughlin had been monitoring his police radio when he heard the report of shots fired, and the description of the suspects as two males on bicycles wearing black shirts or sweatshirts. From where O'Loughlin was standing on New Heath Street, he had an "obstructed, distant view of the [Southwest Corridor Park] bike path," which was elevated and ran perpendicular to his line of sight. Trees, fencing, and signage partially obstructed the view from his position 300 feet away from the bicycle path.

O'Loughlin saw two Black males on bicycles, wearing black shirts or sweatshirts, pedaling southward toward Heath Street,

and reported as much to the police dispatcher.  He told the dispatcher, "You got two Black males coming down Tremont Street right now" toward Heath Street, and he described their appearance as one man wearing "a black vest and a Black male in a black jacket."  O'Loughlin also reported that the pair appeared to be pedaling slowly; he assumed that they were tired.

When the police dispatcher first broadcast the information about the incident, three other officers, in an unmarked sport utility vehicle (SUV), were approximately one and one-half to two miles away from the scene of the shooting.  Officer Korey Franklin was driving the SUV in the vicinity of Blue Hill Avenue and Columbia Road; Officer Gregory Eunis was in the front passenger's seat and Officer Reivilo Degrave was in the rear seat on the passenger's side.  The three officers, all members of the youth violence strike force, were in plain clothes, but were wearing tactical vests that had "Boston Police" printed on the fronts and backs.[1]

Upon hearing the dispatch, Franklin drove quickly in the direction of the reported shooting.  After further details about the incident were broadcast, the officers stopped at the location where O'Loughlin had been speaking to the dispatcher,

---

[1] The officers described the youth violence strike force as a city-wide unit tasked with monitoring neighborhood "hot spots" that are "plagued" by gun-related violence.

and they talked with him.  O'Loughlin told them that two Black males on bicycles, wearing black hoodies, were slowly pedaling toward Heath Street.  Based on O'Loughlin's report, Franklin drove north along Columbus Avenue, which parallels the bike path, to search for the suspects.  At that point, the three officers had heard the dispatcher's description of two males on bicycles in black hoodies, and O'Loughlin's observations that two Black males wearing black hoodies were riding bicycles and heading south toward Heath Street.  The officers had no information about the suspects' age, height, weight, build, hair style, or facial features.

When they reached the area of the Southwest Corridor Park, the officers observed two young Black males wearing black hoodies walking south on Columbus Avenue on the southbound side of the road.  Few other people were outside in the area that evening, and the males were the only two individuals wearing hoodies whom police saw in that location.[2]

The officers drove past the two young men and noticed that each kept continuously looking back over his shoulder toward Boston police headquarters, although nobody appeared to be following them.  Franklin turned the SUV around at Cedar Street,

---

[2] The defendant challenges the judge's finding that "[t]here were not a lot of people out that evening" as not supported by the record and therefore clearly erroneous.  We conclude that it was not clearly erroneous.  See note 4, infra.

and headed south on Columbus Avenue, so that he ended up trailing the two pedestrians. Near the corner of Columbus Avenue and Heath Street, he pulled up adjacent to the two young men, who were on the passenger's side of the SUV. After Franklin stopped the vehicle, Eunis and Degrave got out and approached the two men, who later were identified as the defendant and J.H. The young men did not change their pace as the officers approached. Degrave said, "Hold up a second," and the two complied. Degrave spoke with J.H., while Eunis approached the defendant. The officers did not observe any indications of hidden firearms, such as noticeably weighted pockets or suspicious bulges.

When Degrave asked J.H. whether he had "anything on him," J.H. turned sideways in "kind of like a jerk reaction -- like as a reflex." This resulted in J.H.'s right hip being shielded from the officer. Degrave then pat frisked J.H. and found a firearm in his waistband. As Degrave was conducting the pat frisk, Eunis had been observing the defendant, who was sweating and continuously looking over his shoulder toward Boston police headquarters. Throughout the encounter, the defendant kept his right hand in his sweatshirt pocket but, unlike J.H., did not make any effort to turn or to shield his body. After Degrave found the firearm on J.H.'s person, Eunis "grabbed [the] defendant, pulled him to the ground, secured his arms, and put

him in handcuffs."  A subsequent patfrisk of the defendant revealed a firearm in his pants pocket.  The defendant and J.H. were arrested between 7:35 and 7:36 P.M., approximately seven minutes after the report of shots fired near Annunciation Road. The location where they were stopped is approximately eight-tenths of a mile from Boston police headquarters.

Mary Fowler, a professor of mathematics at Worcester State University, testified in support of the defendant's argument that the investigatory stop violated his rights to equal protection.[3]  Fowler conducted a statistical analysis of the traffic stops Eunis and Degrave had made, which included information about the racial distribution of individuals in the

_____

[3] The defendant moved, pursuant to Mass. R. Crim. P. 14 (a) (2), as appearing in 442 Mass. 1518 (2004), for discovery of statistical data necessary to analyze potential patterns of racial profiling by the arresting officers.  In support of this request, the defendant cited studies indicating that Black men in the city of Boston were more likely to be targeted for police investigation than individuals of other races.  See Commonwealth v. Warren, 475 Mass. 530, 539 (2016).  In addition, counsel cited an Associated Press report that "at least 71% of all street level civilian-police encounters involved minorities while minorities make up about 25% of the Boston population," and stated that, in his experience, officers assigned to the youth violence strike force "consistently stop, search and arrest Black and Brown people at higher rates" than the department-wide statistics.  A judge ordered the Commonwealth to "make available all [field interrogation and observation (FIO)] and arrest reports submitted by Officers Reivilo Degrave and Gregory Eunis" for a two-year period preceding the incident. Fowler utilized this data to "determine if the likelihood of an individual being recorded in an FIO [conducted by Eunis or Degrave] is related to race."

set of field interrogation and observation (FIO) reports submitted by Eunis and Degrave from January 5, 2017, through August 31, 2018.  An estimated fifty-one percent of residents in the officers' patrol area were Black.  Among the 276 individuals who had been subjects of the officers' discretionary stops during that period, 248, or ninety percent, were Black, and five, or two percent, were "white, non-Hispanic."

Fowler compared those figures to data from the United States Census Bureau for the locations of each of the FIOs the officers had reported.  The census data contained the racial distribution of the residents living within the officers' patrol area at the time of the stops at issue, which acted as a benchmark.  Within the twenty-month period, Fowler testified, Black individuals were more than five times as likely to be stopped as other individuals.  Fowler conducted a statistical analysis called an "equality of proportions" test, which indicated that the difference between the frequency of non-Black individuals stopped and the frequency of Black individuals stopped was statistically significant.  Fowler explained that the frequency of randomly observing differences that extreme was less than one in 100,000.  Accordingly, she concluded that the stops were consistent with racial profiling.

b.  Prior proceedings.  A grand jury returned indictments charging the defendant with unlawful possession of a firearm,

G. L. c. 269, § 10 (a); carrying a loaded firearm, G. L. c. 269, § 10 (n); unlawful possession of ammunition, G. L. c. 269, § 10 (h); and discharging a firearm within 500 feet of a building, G. L. c. 269, § 12E.  The defendant filed a motion to suppress the contraband found on his person on the ground that the officers lacked reasonable suspicion at the time of the stop that he had committed a crime and was armed and dangerous.  The motion also argued that the stop violated the defendants' rights to equal protection.  After a three-day hearing, and additional briefing, the motion to suppress was denied.  The defendant then entered a conditional guilty plea, conditioned on reserving his right to appeal from the denial of his motion to suppress.  See Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019).  He filed a timely notice of appeal, and we transferred the case to this court on our own motion.

2.  Discussion.  a.  Reasonable suspicion.  "To justify a police investigatory stop under the Fourth Amendment or art. 14, the police must have 'reasonable suspicion' that the person has committed, is committing, or is about to commit a crime." Commonwealth v. Costa, 448 Mass. 510, 514 (2007), citing Commonwealth v. Lyons, 409 Mass. 16, 18-19 (1990).  Reasonable suspicion "must be based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience" (citation omitted).  Commonwealth v. Gomes, 453

Mass. 506, 511 (2009).  See Terry v. Ohio, 392 U.S. 1, 21 (1968).  The calculus of reasonable suspicion examines "the totality of the facts on which the seizure is based." Commonwealth v. Meneus, 476 Mass. 231, 235 (2017).  See Commonwealth v. Henley, 488 Mass. 95, 103 (2021) (determining whether factors, "when viewed as a whole," gave rise to reasonable suspicion).  Reasonable suspicion must be more than a hunch.  Lyons, supra at 19.

In this case, we must determine whether the officers had reasonable suspicion when Eunis and Degrave, wearing Boston police tactical vests, got out of their unmarked SUV, approached the two young men, and told them to "[h]old up a second."  See Commonwealth v. Evelyn, 485 Mass. 691, 699 (2020) ("the naiveté, immaturity, and vulnerability of a child will imbue the objective communications of a police officer with greater coercive power"); Commonwealth v. Matta, 483 Mass. 357, 362 (2019) (seizure occurs when officer "objectively communicate[s] that the officer would use . . . police power to coerce [a suspect] to stay").  When reviewing the disposition of a motion to suppress, we accept the motion judge's subsidiary findings absent clear error, and "make an independent determination whether the judge properly applied constitutional principles to the facts as found."  Commonwealth v. Lyles, 453 Mass. 811, 814 (2009).

The defendant argues that the officers had only a generic description of the suspects as Black males wearing black hoodies, which left virtually nothing to distinguish the suspects from others in the area. When they were stopped, the defendant and J.H. were on foot, and were not riding bicycles as the suspects were reported to have done. In addition, the stop took place "nearly one mile away" from the location where the shots were reported, and the context of the stop, in a busy residential and retail area, early in the evening, made it less reasonable to conclude that the defendant and J.H. were more likely to be the shooters than anyone else in the area.

The Commonwealth maintains that there was reasonable suspicion for the stop because of the defendant's and J.H.'s temporal and geographic proximity to the scene of the shooting, the similarity between the description of the two shooters and the appearance of the defendant and J.H., their nervous and evasive behavior, and the ongoing safety concern related to multiple shots being fired in a populated area.

i. Physical description. The fact that an individual matches a broad, general description does not alone amount to reasonable suspicion, particularly if that description could fit many people in the area where the stop takes place. See Commonwealth v. Warren, 475 Mass. 530, 535 (2016) (description of suspects as three Black males wearing dark clothing, one

wearing red hoodie, without any description of their facial features, hairstyles, height, weight, or other physical characteristics, was insufficient to support reasonable suspicion that Black male in general area wearing dark clothing was involved); Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) ("the description of the suspect as a '[B]lack male with a black 3/4 length goose' [jacket] could have fit a large number of men who reside in the Grove Hall section of Roxbury"); Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 554, 557 (2002) (general description that fails to distinguish suspect from others cannot alone support reasonable suspicion).  Nonetheless, use of a general description is not an insurmountable obstacle to a finding of reasonable suspicion.  "[T]he value of a vague or general description in the reasonable suspicion analysis may be enhanced if other factors known to the police make it reasonable to surmise that the suspect was involved in the crime under investigation."  Meneus, 476 Mass. at 237.

Prior to the stop of the defendant and J.H., the officers knew only that they were searching for two Black male suspects, who were wearing black hooded sweatshirts, and were riding bicycles in a particular direction.  No information had been communicated about the suspects' facial features, hairstyles, skin tone, height, weight, or other physical characteristics that could have contributed to the officers' ability to

distinguish the suspects from everyone else in the area.  See Warren, 475 Mass. at 535.  Moreover, at the time of the stop, the defendant and J.H. were walking, and not riding bicycles as the suspects were reported to have done.  Thus, the description of the suspects, standing alone, was too general to give rise to reasonable suspicion to stop the defendant.  Indeed, the judge recognized the description as being "generic."  See id. at 535-536 ("With only this vague description, it was simply not possible for the police reasonably and rationally to target the defendant or any other black male wearing dark clothing as a suspect in the crime").

The inquiry, however, does not end there.  The judge also properly considered whether other pieces of information allowed the officers to narrow the range of suspects from a generic description fitting many members of the community to particular individuals.  See Meneus, 476 Mass. at 237.  See, e.g., Commonwealth v. Depina, 456 Mass. 238, 246-247 (2010) (general description that was insufficiently detailed and particularized to provide police reason to stop any person matching that description was bolstered by "accompanying circumstances"); Commonwealth v. Mercado, 422 Mass. 367, 371 (1996) (general description combined with other relevant factors may provide adequate narrowing of description such that police have reasonable suspicion).

Thus, we turn to consider whether the bare-bones description of the suspects as Black men wearing black hoodies was enhanced by other factors relevant to a determination of reasonable suspicion.

ii.  Nervous or evasive behavior.  The judge noted that the defendant and J.H. were exhibiting nervous behavior when the officers saw them walking approximately one mile from the scene of the shooting.  The officers testified, and the judge found, that the two young men "repeatedly look[ed] back 'over their shoulders' toward Boston [p]olice [h]eadquarters, although no one was following them."  The judge determined that this nervous behavior was an additional factor that could be considered in the calculus as to whether the officers had reasonable suspicion at the time of the stop.

The defendant argues that the judge's finding of nervousness "added little, if anything, to the suspicion equation."  The officers would have been limited only to speculating that "the teenagers' head movements were related to the shots-fired incident, which took place nearly one mile away."

In Commonwealth v. Karen K., 491 Mass. 165, 179 (2023), we considered whether evidence that a juvenile was "repeated[ly] looking over her shoulder and . . . attempt[ing] to avoid police officers" was properly factored into the analysis of reasonable

suspicion.  We observed that, although "nervous or furtive movements do not supply reasonable suspicion when considered in isolation," taken together with other factors, they may be considered as supporting reasonable suspicion.  Id. at 179, quoting Commonwealth v. DePeiza, 449 Mass. 367, 372 (2007).  See Commonwealth v. Barros, 425 Mass. 572, 584 (1997) (reasonable suspicion was supported by observation of three men "walking rapidly away from the crime scene while glancing over their shoulders").

At the same time, caution must be exercised in considering nervous or evasive behavior in the calculus of reasonable suspicion.  "[I]n some instances, the fact that members of certain groups -- such as Black males in Boston -- have been disproportionately and repeatedly targeted for police encounters suggests a reason" for flight or evasive conduct unrelated to any possible consciousness of guilt (quotations and alterations omitted).  Karen K., 491 Mass. at 179-180.  See Evelyn, 485 Mass. at 708-709 (nervousness and evasive behavior must be considered in context of unwillingness to engage in conversation with police); Warren, 475 Mass. at 540 (flight of Black man from Boston police officers, based on reports of racial profiling, was "not necessarily probative of . . . consciousness of guilt"); Commonwealth v. Martin, 457 Mass. 14, 21 (2010) (in

light of his young age, defendant's nervousness around police officer added little to determination of reasonable suspicion).

There was no error in the judge's decision to consider the defendant's act of repeatedly glancing over his shoulder toward Boston police headquarters in the analysis of reasonable suspicion.  See Barros, 425 Mass. at 584.  Notably, the concerns expressed in Karen K., 491 Mass. at 179-180; Evelyn, 485 Mass. at 708-709; Warren, 475 Mass. at 540; and Martin, 457 Mass. at 21, are not present here.  The officers were driving an unmarked vehicle, and there was no evidence that the defendant and J.H. were aware that the car that drove past them in the opposite direction was a police vehicle.  In particular, the judge found that the defendant and J.H. were nervously glancing over their shoulders "before they were aware of . . . Franklin's unmarked vehicle."  Thus, the officers' approach cannot be considered the source of the defendant's nervousness.

iii.  Geographic and temporal factors.  The judge also relied on the defendant's geographic and temporal proximity to the location of the shooting to bolster his view of the officers' ability to distinguish the defendant and J.H. from other Black men wearing black hooded sweatshirts.  The judge determined that the "[d]efendant and J.H. were moving in the direction of flight from the scene where shots were fired and were observed there only a few minutes after the shots were

reported.  As in Evelyn[, 485 Mass. at 708-709,] and Depina[, 456 Mass. at 246-247,] [the] defendant's location and direction of travel were consistent with the expected location and direction of travel of the suspects at that time."

The defendant contends that his proximity to the location of the crime, minutes after the reports of shots fired, did not support a finding of reasonable suspicion.  Relying on Warren, 475 Mass. at 536-537, he argues that the officers had limited information concerning the direction of the suspects' flight. In the defendant's view, the officers, "could only guess where the suspects went . . . .  On bicycles, within minutes, the suspects could have been in any number of neighborhoods in the dense city of Boston."  See Meneus, 476 Mass. at 233-234, 240 (no reasonable suspicion despite report that young men ran into courtyard of housing complex).  The defendant notes that, while he was stopped only minutes after the shooting, the distance of one mile from the scene, on a spring evening where Degrave testified that "a lot of people" were "walking around," but according to Eunis, no one "stood out," did not support a finding of reasonable suspicion.[4]

---

[4] As stated, see note 2, supra, the defendant challenges the judge's finding that "[t]here were not a lot of people out that evening" as clearly erroneous.  A finding is clearly erroneous "only if the reviewing court has a firm conviction that a mistake has been committed" (citation and quotation omitted). Commonwealth v. Bresnahan, 462 Mass. 761, 775 (2012).  Eunis

The presence of a suspect in geographic and temporal proximity to the scene of the crime under investigation appropriately may be considered as a factor in the calculus of reasonable suspicion.  See, e.g., Henley, 488 Mass. at 103 (officers had reasonable suspicion where defendant was stopped two blocks away from, and five minutes after, shooting); Evelyn, 485 Mass. at 704-705 (defendant being stopped thirteen minutes after shooting, one-half mile away from scene, weighed in favor of reasonable suspicion); Depina, 456 Mass. at 246 (defendant being within three blocks of crime scene ten minutes after shooting added to calculus of reasonable suspicion).  "Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close." Warren, 475 Mass. at 536.

In Warren, 475 Mass. at 536-537, the defendant was stopped one mile from the scene of the crime, approximately twenty-five to thirty minutes after a breaking and entering had taken place.

---

testified that he did not see any other pedestrians that stood out to him that night, that he did not remember seeing other individuals, and that the defendant and J.H. "were the only two people I seen walking in that area."  The judge apparently credited this testimony, rather than Degrave's testimony that "[i]t's a very commonly-traveled area.  Some people were on foot.  A lot of people were just walking around . . . ."  The fact that Eunis's testimony was contradicted by his partner's testimony does not render the judge's finding clearly erroneous. "A judge may accept or reject, in whole or part, the testimony offered on a motion to suppress."  Commonwealth v. Harvey, 390 Mass. 203, 206 n.4 (1983).

We determined that the broad time frame, combined with speculative evidence concerning the path of flight, could have placed the suspect anywhere in multiple neighborhoods within a two-mile radius of the crime scene.  Id. at 536-537.  The location and timing of that stop, therefore, were "no more than random occurrences . . . where the direction of the perpetrator's path of flight was mere conjecture."  Id. at 536.

Here, by contrast, the defendant and J.H. were stopped seven minutes after the initial report of shots having been fired, approximately one mile from the scene of the shooting. The location of the stop was not a "random occurrence." Multiple reports by witnesses and police officers followed the path of the suspects as they traveled from near the scene on Annunciation Road to Columbus Avenue near the Southwest Corridor Park.  The first person who called 911 told the emergency operator that multiple shots had been fired on Annunciation Road.  The second caller provided another relevant location when she said that, from her position at a corner near the Southwest Corridor Park, a few blocks away from Annunciation Road, she saw two men wearing black hoodies riding bicycles, and heading south on Tremont Street in the direction of Heath Street.  Within one minute, O'Loughlin saw two men, wearing dark hoodies, riding bicycles on the Southwest Corridor bike path, heading south toward Heath Street.  A short time after speaking with

O'Loughlin, Degrave and Eunis spotted the defendant and J.H. on foot at the corner of Columbus Avenue and Heath Street, walking south.

Accordingly, here, unlike in Warren, 475 Mass. at 536-537, the judge properly considered the defendant's geographic and temporal location relative to the scene of the crime under investigation as factors in his calculus of reasonable suspicion.

iv. Nature of the crime. The judge observed that "the officers were looking for suspects in a shooting that had occurred nearby, a very short time before." The shooting took place in a dense residential and commercial area, near a university and a train station. The judge concluded that the "gravity of this crime and the fact that the shooters were at large further supports the officers' stop."

The seriousness of the offense, and the danger presented to the community, are factors that properly may be considered in assessing whether police had reasonable suspicion at the time of a stop. Depina, 456 Mass. at 247. See, e.g., Henley, 488 Mass. at 104 ("we consider that the circumstances of this crime, a shooting that left one victim dead, presented ongoing risk to public safety"); Evelyn, 485 Mass. at 705 ("circumstances indicated a potential ongoing risk to public safety, and therefore weighed in favor of reasonable suspicion"); Meneus,

476 Mass. at 239 ("fact that the crime under investigation was a shooting, with implications for public safety, was relevant but not dispositive in determining the reasonableness of the stop"); Commonwealth v. Lopes, 455 Mass. 147, 157-159 (2009) (in evaluating reasonable suspicion to justify stop, court considered report that van had been involved in homicide).

Given the facts found by the judge, we conclude that the officers had reasonable suspicion to stop the defendant to investigate the shooting. As in other cases discussed supra, reasonable suspicion in this case was "based on a convergence of supporting factors," including the defendant's nervous or evasive behavior, his geographic and temporal proximity to the area of the shooting, the location of a likely flight path, and the ongoing threat to public safety. See Henley, 488 Mass. at 105. While the description of the two suspects was, as the judge described it, "generic" and, standing alone, was insufficient to provide reasonable suspicion for an investigatory stop, the additional factors narrowed the search for suspects such that the officers did have reasonable suspicion when they stopped the defendant. Accordingly, the stop did not violate the defendant's right to be free from unreasonable searches and seizures.

b. Equal protection. In addition to his argument that he had been subject to an unreasonable search and seizure, the

defendant moved to suppress the evidence seized as a result of the stop on the ground of equal protection.  He argued that the officers violated his right to be protected from selective enforcement of the laws, and urged the judge, in analyzing this contention, to apply the less-stringent equal protection standard set forth in Long, 485 Mass. at 723-725, rather than the traditional three-part test elucidated in Commonwealth v. Franklin, 376 Mass. 885, 894-895 (1978).  Under the Long standard, the defendant argued, "once the low bar of a reasonable inference of discriminatory motive has been established -- a burden of production -- the burden of proof of non-discrimination shifts to the Commonwealth."  See Long, supra at 735.  The defendant maintained that the Commonwealth had failed to rebut the inference of discriminatory motive, which was supported by Fowler's statistical evidence.

The Commonwealth argued that the Long standard is limited to traffic stops, and therefore is inapplicable to a pedestrian stop.  In the Commonwealth's view, a selective enforcement claim arising out of a pedestrian stop requires evaluation under the more rigorous, three-part test set forth in Franklin, 376 Mass. at 894.  In any event, the Commonwealth maintained, whatever the applicable standard, it had presented an adequate, race-neutral justification for the stop.

The judge agreed with the defendant that the Long standard applies with equal force to pedestrian stops as to traffic stops. He reasoned, "just as a racially motivated motor vehicle stop would be constitutionally problematic, a racially motivated stop of a pedestrian would also offend the constitutional right to equal protection." Under the Long standard, the judge explained, "[o]nce a defendant raises a reasonable inference that a stop was racially motivated, the burden shifts to the Commonwealth 'to provide a race-neutral explanation for such a stop.'" See Commonwealth v. Lora, 451 Mass. 425, 426 (2008). See also Long, 485 Mass. at 723-725. The judge then concluded that he "need not address the question of a threshold showing because the officers had a race-neutral motivation for stopping the defendant."

In reviewing the judge's decision, we first must determine whether the judge erred in applying the Long standard to a challenge to a pedestrian stop. We then must decide whether there was error in the judge's conclusion that the Commonwealth met its burden of rebutting an inference of selective enforcement by articulating an adequate, race-neutral reason for the stop.

i. Selective enforcement and selective prosecution. Equal protection jurisprudence encompasses two broad categories of rights, which protect people against selective prosecution and

selective enforcement.  Selective prosecution refers to the decision to charge a person with a crime based upon impermissible criteria such as race, national origin, or gender, resulting in a greater number of convictions of persons who share that characteristic compared to similarly situated persons who do not.  See Commonwealth v. Bernardo B., 453 Mass. 158, 167-169 (2009).  Selective enforcement refers to law enforcement practices that unjustifiably target an individual for investigation based on the individual's race or other protected class.  See Lora, 451 Mass. at 436-437.  These categories are often confused, and the terms used interchangeably.  See United States v. Washington, 869 F.3d 193, 214 (3d Cir. 2017), cert. denied, 138 S. Ct. 713 (2018).  In this case, we refer to claims of discriminatory police investigative practices as selective enforcement.

ii.  Burden of proof.  Prior to our decision in Long, 485 Mass. at 724-725, all equal protection challenges under arts. 1 and 10 of the Massachusetts Declaration of Rights required review under a tripartite burden.  See Lora, 451 Mass. at 437-438.  See also United States v. Armstrong, 517 U.S. 456, 465 (1996) ("ordinary" equal protection claim brought under Fourteenth Amendment to United States Constitution requires proof of discriminatory effect, motivated by discriminatory purpose, and that similarly situated individuals were not

prosecuted); Washington, 869 F.3d at 214 (substantive claims of selective prosecution and selective enforcement are evaluated under same test). Under this standard, the defendant bears the initial burden of demonstrating selective enforcement by presenting some evidence that raises at least a reasonable inference of impermissible discrimination. This must include evidence that a broader class of persons than those prosecuted or investigated has violated the law. See Lora, supra at 437. Second, the defendant must establish that failure to enforce the law was either consistent or deliberate. Id. Third, the evidence must show that the decision not to enforce or prosecute was based on membership in a protected class, such as race. Id. If a defendant is able to raise a reasonable inference of selective enforcement by presenting credible evidence that, deliberately or consistently, similarly situated individuals who are not members of the protected class have not been prosecuted, the Commonwealth must rebut that inference of discrimination. Id. at 438. The remedy for a selective enforcement violation is suppression of the evidence that was obtained in violation of the defendant's constitutional right to equal protection. Id. at 439.

In Long, 485 Mass. at 723-725, we revised the standard by which a defendant can establish a claim of selective enforcement, in the context of the traffic laws. In deciding

that such a change was necessary, we explained, "it is clear that Lora has placed too great an evidentiary burden on defendants.  The right of drivers to be free from racial profiling will remain illusory unless and until it is supported by a workable remedy."  Id. at 721.

Under the revised standard, it is the defendant's burden to demonstrate that the decision to make the traffic stop was motivated by race or another constitutionally protected class.  A defendant may do so by producing "evidence upon which a reasonable person could rely to infer that the officer discriminated on the basis of the defendant's race or membership in another protected class."  Id. at 723-724.  The defendant must point to specific facts that support such an inference, which are known to the defendant based on "personal knowledge, the defendant's own investigation, evidence obtained during discovery, and other relevant sources."  Id. at 724.  A bald allegation of selective enforcement, based only on membership in a constitutionally protected class, would not suffice.  See id. at 723.  If the defendant does raise an inference of discrimination, the burden shifts to the Commonwealth to rebut the inference by establishing a race-neutral reason for the stop.

Our decision in Long, 485 Mass. at 721-723, noted explicitly that we had revised the standard by which to

establish an equal protection claim involving allegations of discriminatory traffic stops, given the difficulties defendants had experienced in establishing claims for selective enforcement based on race under the Lora framework.  See Long, supra, and cases cited.  We did not address whether this standard was to extend to all claims of selective enforcement, a question we had no need to reach.  The issue having been squarely raised here, we conclude that the equal protection standard established in Long for traffic stops applies equally to pedestrian stops and threshold inquiries, as well as other selective enforcement claims challenging police investigatory practices.

In Long, 485 Mass. at 722, we determined that the first two parts of the three-part Franklin standard are not necessary in the context of motor vehicle stops.  We explained that,

> "because of the ubiquity of traffic violations, only a tiny percentage of these violations ultimately result in motor vehicle stops, warnings, or citations.  Thus, it is virtually always the case that a broader class of persons violated the law than those against whom the law was enforced.  Similarly, in stopping one vehicle but not another, an officer necessarily has made a deliberate choice."  (Quotation and citation omitted.)

Id.  Accordingly, the appropriate inquiry is restricted to whether the traffic stop was motivated by the driver's race or membership in another protected class.  Id. at 723.

For similar reasons, the three-part Franklin standard is equally ill-suited to other claims of discriminatory law

enforcement practices. There is no reason to anticipate, for example, that a defendant challenging a threshold inquiry on the sidewalk in front of a public housing complex would be better able to prove a negative -- that similarly situated suspects of other races were not investigated. See Washington, 869 F.3d at 216 (revising Federal discovery standard in selective enforcement cases because "there are likely to be no records of similarly situated individuals who were not arrested or investigated"). "Asking a defendant claiming selective enforcement to prove who could have been targeted by an informant, but was not, or who the [investigating agency] could have investigated, but did not, is asking [the defendant] to prove a negative; there is simply no statistical record for a defendant to point to." United States v. Sellers, 906 F.3d 848, 853 (9th Cir. 2018).

The inaccessibility or unavailability of relevant data in such situations stands in contrast to cases of selective prosecution, which occur "when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race" or another protected class. See Conley v. United States, 5 F.4th 781, 789 (7th Cir. 2021). In Bernardo B., 453 Mass. at 173, for example, we considered a selective prosecution claim arising from a district attorney's practice of declining to bring statutory rape charges against

female complainants, "where the facts described by the girls could be viewed as contravening those same laws by them." See Franklin, 376 Mass. at 896-897 (selective prosecution claim alleging that white residents of housing project were not arrested for violent crimes, and that "police, prosecutors, and court officials assigned to work in that area insulated whites from being punished for their participation in those incidents").[5]

Moreover, a claim of selective prosecution implicates the discretionary authority of the executive branch to enforce the criminal laws. See Commonwealth v. Ehiabhi, 478 Mass. 154, 160 (2017) ("the decision to prosecute is particularly ill-suited to judicial review" [citation and quotation omitted]); Bernardo B., 453 Mass. at 161 (judicial review of decisions to prosecute "must proceed circumspectly lest we intrude on a function constitutionally vouchsafed to another branch of government"). The presumption of regularity, a deference doctrine, limits judicial scrutiny of certain executive branch decisions. See Armstrong, 517 U.S. at 464; Bernardo B., 453 Mass. at 161; The

---

[5] We note that the decision to conduct a pedestrian stop, or to investigate a suspect, is a "deliberate choice," thus satisfying the requirement under the second part of the three-part Franklin test, see Franklin, 376 Mass. at 894, that a defendant show that the failure to prosecute was deliberate.

Presumption of Regularity in Judicial Review of the Executive Branch, 131 Harv. L. Rev. 2431, 2432 (2018).

In Massachusetts, the presumption of regularity encompasses charging decisions by both police officers and prosecutors. See Lora, 451 Mass. at 437. "An arrest or prosecution based on probable cause . . . ordinarily [is] cloaked with a presumption of regularity. Because we presume that criminal prosecutions are undertaken in good faith, without intent to discriminate, the defendant bears the initial burden of demonstrating selective enforcement" (citation and quotation omitted). Id. See Franklin, 376 Mass. at 894 ("prosecutors and other law enforcement officers enjoy considerable discretion in exercising some selectivity for purposes consistent with the public interest . . . [b]ecause we presume that criminal prosecutions are undertaken in good faith, without intent to discriminate"); Commonwealth v. King, 374 Mass. 5, 22 (1977) ("we presume that criminal arrests and prosecutions are undertaken in good faith, without intent to discriminate").

The presumption of regularity, however, applies to decisions by prosecutors and police officers to charge an individual with a crime; it does not apply to street-level police investigations. See Conley, 5 F.4th at 791 (presumption of regularity did not shield police "sting" operation from scrutiny because doctrine "is driven by separation of powers

concerns, which increase as courts venture closer to core executive activity").  While decisions by police officers "certainly reflect law enforcement priorities, judicial inquiry into their motives is routine."  Id.  See Sellers, 906 F.3d at 853 (Federal agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior" [citation omitted]).  "Unlike prosecutors, agents [of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and of the Federal Bureau of Investigation] regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel.  They also may have to testify in pretrial proceedings, such as motions to suppress evidence, and again their honesty is open to challenge."  United States v. Davis, 793 F.3d 712, 720-721 (7th Cir. 2015) (en banc).

iii.  Application.  As discussed supra, a defendant raising a claim of selective enforcement based on alleged discriminatory policing practices bears the initial burden of establishing a reasonable inference that the investigation was motivated by race or membership in another constitutionally protected class. See Long, 485 Mass. at 724.  The defendant must point to "specific facts" about the police investigation that support such an inference.  Id.  If the defendant succeeds in doing so, the burden shifts to the Commonwealth to rebut the inference of discrimination.  Id.

In examining a claim of selective enforcement, a reviewing judge must consider the totality of the circumstances surrounding the claim.  See Long, 485 Mass. at 724-725.  In the context of police investigations such as pedestrian stops, the totality of the circumstances may include patterns of enforcement actions by the particular officer; the events preceding the investigation, i.e., the reasons the officer decided to target the defendant; the seriousness of the crime being investigated; and whether the defendant's race or ethnicity, or membership in another protected class, was part of a description of the suspect.  See, e.g., State v. Nyema, 249 N.J. 509, 530 (2021), quoting New Jersey Attorney General, Directive Establishing an Official Statewide Policy Defining and Prohibiting the Practice of "Racially-Influenced Policing" (June 28, 2005) (directive prohibiting racially influenced policing allowed officers to take into account "a person's race or ethnicity when race or ethnicity is used to describe physical characteristics that identify a particular individual . . . being sought by a law enforcement agency in furtherance of a specific investigation or prosecution").  See also Brown v. Oneonta, 221 F.3d 329, 338-339 (2nd Cir. 2000), cert. denied, 534 U.S. 816 (2001) (where police possess description of suspect consisting primarily of race and gender, they are permitted to act on basis of that description, absent evidence of racial

animus); United States v. Avery, 137 F.3d 343, 354 n.5 (6th Cir. 1997) (use of race as descriptive factor is not prohibited under equal protection clause, provided that police do not engage in dragnet tactics).

A decision by the Supreme Court of New Jersey is illustrative of a case where the court considered a defendant's selective enforcement claim arising out of an allegedly racially motivated threshold inquiry. See State v. Maryland, 167 N.J. 471 (2001). In that case, undercover police officers confronted two young Black men, who were arriving at a train station along with numerous other rush-hour commuters. Id. at 477, 485. The officers approached and asked to speak to the men. A struggle ensued when the defendant turned his body and reached into his waistband, and several bags of marijuana fell to the ground. Id. at 478. In reviewing the defendant's claim for selective enforcement, the court concluded that there had been no violation of a Federal or State right to be free from unreasonable searches and seizures, because the officers were entitled to approach and ask questions "without grounds for suspicion" (citation omitted). Id. at 483.

Nonetheless, the court went on to consider whether the decision to target the defendant for investigation constituted selective enforcement in violation of the defendant's right to equal protection of the laws. Id. at 485-486. The court

observed that the equal protection clause of the Fourteenth Amendment "requires that the selection of a person for a field inquiry . . . may not be based solely on that person's race absent some compelling justification that pre-existed the police approaching the individual."  Id. at 485.  The court then determined that the officers' hunch that the defendant had possessed narcotics was based, at least in part, on "racial stereotyping."  Id. at 486.  The undercover officers were patrolling the train station to prevent vandalism and graffiti. They were not conducting a narcotics investigation, and the officers had no reason to suspect that drugs were being carried through the train station.  Nor had they observed anything to suggest that the defendant was involved in a drug deal.  Id. at 488.  Accordingly, the court concluded that the government had "failed to overcome the inference . . . that this was a proscribed race-based field inquiry."  Id. at 489.

Here, by contrast, we discern no error in the judge's conclusion that the Commonwealth rebutted an inference of selective enforcement raised by the statistical evidence.  The Commonwealth demonstrated that the police officers had a race-neutral reason to have conducted a pedestrian stop of the defendant and J.H., the suspects in the case of reported shots fired.  The second 911 caller introduced the suspects' race to the investigation when she reported that she heard multiple

gunshots and then saw two Black men on bicycles wearing black hoodies.  Within minutes of the 911 call, O'Loughlin told the responding officers that he had seen two Black males, on bicycles, wearing black hooded sweatshirts, heading towards Heath Street.  In short order, the officers located the suspects, who were walking in a direction "consistent in time and direction with two individuals fleeing from a shooting on bicycles."

The defendant contends that, in denying his motion to suppress on the ground of equal protection, the judge conflated the requirements of art. 14 and the equal protection analysis. The defendant argues that the "equal protection question was not answered by the motion judge's art. 14 determination that the officers had reasonable suspicion to conduct the stop -- that analysis is simply inapposite to rebutting the defendant's prima facie statistical case, apples and oranges."  According to the defendant, "Long's plain language dictates that the Commonwealth cannot ignore or sidestep a defendant's statistical case," and therefore the judge "erroneously absolved the Commonwealth of its equal protection rebuttal burden."

We emphasize that the Federal and State constitutional guarantees of equal protection of the laws provide residents of the Commonwealth a degree of protection separate and distinct from the prohibition against unreasonable searches and searches

under the Fourth Amendment and art. 14.  See Whren v. United States, 517 U.S. 806, 813 (1996) (constitutional basis for objecting to discriminatory application of law is guarantee of equal protection, not violation of Fourth Amendment); Lora, 451 Mass. at 436 (same).  See also Nieves v. Bartlett, 139 S. Ct. 1715, 1731 (2019) (Gorsuch, J., concurring) (detention based on race, even where detention otherwise would be permissible under Fourth Amendment, violates equal protection).

As the United States Court of Appeals for the Sixth Circuit has explained, the guarantee of equal protection "does not fit neatly into the various stages of Fourth Amendment search and seizure analysis."  Avery, 137 F.3d at 355.  Because the equal protection clause is intended to prevent discriminatory governmental conduct, the particular "stage" of an investigation is not relevant.  See id.  "[T]he heart of the [e]qual [p]rotection [c]lause is its prohibition of discriminatory treatment.  If a government actor has imposed unequal burdens based upon race, it has violated the [equal protection] clause" (citation omitted).  Id.  See Nyema, 249 N.J. at 529 (investigative techniques that do not qualify as searches or seizures requiring reasonable suspicion "must still comport with the [e]qual [p]rotection [c]lause").  See also Marshall v. Columbia Lea Regional Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003) ("That [the plaintiff's] stop and arrest were based on

probable cause does not resolve his more troubling claim that he was targeted by [a police officer] on account of his race").

That does not mean, however, that the Commonwealth is precluded from explaining why a police officer stopped a motor vehicle or conducted a threshold inquiry. See Long, 485 Mass. at 724-725. There may be substantial overlap between an inquiry into the reasonableness of a stop and the officer's motivation for stopping a suspect.[6] To be sure, the constitutional basis for the stop is not sufficient, standing alone, to rebut an inference of selective enforcement. See id. at 726 ("To meet its burden, the Commonwealth would have to do more than merely point to the validity of the traffic violation that was the asserted reason for the stop"). The burden shifts to the Commonwealth to "grapple with all of the reasonable inferences

---

[6] In Long, 485 Mass. at 725, we included within the totality of circumstances a judge could consider "the safety interests in enforcing the motor vehicle violation." For example, a police officer may stop a vehicle traveling at 110 miles per hour on a highway. The driver's excessive and unsafe speed would be both the reason for the stop and most likely an adequate, nondiscriminatory reason to stop the vehicle. By contrast, a police officer is permitted to stop a vehicle traveling at sixty-six miles per hour on a highway as a violation of the speed limit of sixty-five miles per hour. See Commonwealth v. Bacon, 381 Mass. 642, 644 (1980) (police were warranted in stopping vehicle based on observation of traffic violation). This latter, nominal traffic violation, however, would not suffice as an adequate, race-neutral reason to rebut an inference of racial profiling.

and all of the evidence that a defendant presented and would have to prove that the stop was not racially motivated."  Id.

Here, the judge was required to determine whether the Commonwealth had rebutted the reasonable inference that the stop or investigation was not "motivated at least in part by race" or another impermissible classification.  Id.  We conclude that the evidence supported the judge's determination that police stopped the defendant to investigate his involvement in a recent shooting, and not because of his race.

3.  Conclusion.  As there was no violation of the defendant's rights to be protected against unreasonable searches and seizures, and against selective enforcement of the laws, there was no error in the judge's denial of the defendant's motion to suppress.

Order denying motion
to suppress affirmed.